# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:07-CR-104-TS |
| | ) | |
| MICHAEL A. KING, JR., | ) | |

## OPINION and ORDER

Before the Court is a Motion to Suppress Evidence [DE 16], filed on February 26, 2008. The Defendant, Michael A. King, Jr., asks the Court to exclude evidence that was recovered from a search of a car during a November 9, 2007, traffic stop. The Defendant argues that the police searched the car, in which he was a passenger, without justification or authority.

## BACKGROUND

On December 19, 2007, the Defendant was indicted for a violation of 18 U.S.C. § 922(g)(1), being a felon in possession of a firearm. On December 28, the Defendant pleaded not guilty. On February 26, 2008, the Defendant filed the present Motion [DE 16] and a Memorandum in Support [DE 17]. The Court held an evidentiary hearing on May 22. On July 18, the Defendant filed a Brief in Support of the Motion to Suppress Evidence [DE 25]. On August 4, the government filed its Post-Hearing Brief in Opposition to Motion to Suppress [DE 27].

## STATEMENT OF FACTS

On November 9, 2007, Fort Wayne Police Department Officers Nicholas Lichtsinn and Chris Hoffman—who are members of an anti-gang unit that is a joint effort of the Fort Wayne

Police Department and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF)—were on patrol in an unmarked police car.[1] Hoffman was driving.

Lichtsinn and Hoffman observed a Buick Park Avenue ("Buick") stopped with its engine running in the 700 block of West DeWald Street. The officers were suspicious of the vehicle because it was in front of a house they knew to be connected to gang activity. Lichtsinn testified that "what drew my attention to it is previously that week or the week before, we had been to that house reference several gang members that were there." (Tr. 6:9–11.) Hoffman said that he was suspicious because the car was "in front of a known gang member hangout house." (*Id.* at 34:16.) The officers based this assessment on their prior enforcement activity at the house, including several arrests. Hoffman testified: "I've been to the house, I've been in the house, I've talked to gang members at that house." (*Id.* at 34:19–20.) Hoffman said that he had made several arrests at the house within the two months prior to November 9. He arrested one individual based on a warrant and for false informing when the suspect gave a false name to Hoffman. Lichtsinn also had arrested persons at the house based on warrants. Hoffman also concluded that the residence was a gang house based on the persons there meeting two of eight Justice Department criteria for being gang members, although Hoffman said he could not recall which criteria led him to conclude there were gang members at the house. Both officers said that they had not observed the Defendant at the house on those prior occasions.

In their unmarked car, the officers began following the Buick when it left the DeWald Street location. Lichtsinn said he observed two persons leave the house and get into the car before it left; Hoffman said he first noticed a passenger in the car when the car turned

---

[1] Hoffman said the unmarked police car "looks like a security guard car. . . . It looks like a police car. It's just not got the stickers on it." (Tr. 40:4–6.)

southbound onto Fox Avenue. (The car's driver was Demetrick Freeman, and the passenger was the Defendant.) The officers testified that they intended to conduct a traffic stop as soon as the driver committed a traffic violation. Hoffman said the car "was floating about the roadway" on Fox Avenue. (*Id.* at 25:21.) Fox Avenue comes to a T-intersection with Home Avenue, and there is a stop sign for vehicles on Fox Avenue at that intersection. When the car reached that intersection, which was about six or seven blocks from DeWald Street, it stopped. Officer Lichtsinn said the turn signal was activated as the car "was in the process of turning at the intersection." (*Id.* at 7:8–9.) Officer Hoffman testified that "[t]he vehicle didn't signal until it stopped on Fox at Home, which drew our attention; it led us to believe the vehicle signaled only after seeing our vehicle behind them." (*Id.* at 25:23–25.) The officers believed the driver's use of the turn signal violated Indiana Code § 9-21-8-25,[2] which requires drivers to activate a turn signal 200 feet before turning. Hoffman testified that the area was lit well enough to permit a driver to see from 200 feet away that there was a T-intersection at Fox Avenue and Home Avenue. (*Id.* at 41:17–21; 42:1–4, 8–10; 42:6–7.)

After the car turned onto Home Avenue, the officers activated their vehicle's lights and sirens. Lichtsinn said the vehicle "took a while to pull over, approximately a half block of slow driving before it eventually pulled over." (*Id.* at 7:25–8:1.) Hoffman also said "[i]t took quite a while," (*id.* at 27:22), for the car to pull over between South Wayne Avenue and Fairfield Avenue, which means it continued moving for about a block and a half before finally pulling

---

[2] The statute states:
A signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes. A vehicle traveling in a speed zone of at least fifty (50) miles per hour shall give a signal continuously for not less than the last three hundred (300) feet traveled by the vehicle before turning or changing lanes.
Ind. Code § 9-21-8-25.

over. Hoffman approached the car on the driver's side, and Lichtsinn approached on the passenger's side. Hoffman testified that the time of night was a concern, (*id.* at 29:19–21), and Lichtsinn testified that the fact that the traffic stop occurred at 10:30 p.m. was a factor in his concern for safety. (*Id.* at 22:19–21.)

Hoffman testified that, as they approached, "we both commented that we observed an abundant amount of movement, more than seen in a typical traffic stop by the front seat passenger, and we both verbalized that to each other as we were approaching." (*Id.* at 28:10–14.) Lichtsinn testified: "Upon initial approach to the vehicle, I noticed that the passenger, his right shoulder came up, and then went back down as if he was retrieving or placing something in or about his waistband or lower body." (*Id.* at 8:7–10.) He added that he believed he told Hoffman, "Watch his hand," (*id.* at 23:4–5), as they approached. Lichtsinn said the Defendant's hands appeared to be in front of him. "His right shoulder lifted up significantly, and then dropped back down as if it were being placed straight between the door jamb or the door panel and the seat." (*Id.* at 16:3–6.) He added that "the passenger and the driver both would not show us their right hands. They had them concealed from our view." (*Id.* at 8:17–18.)

Lichtsinn said he believed but was not certain that the driver had rolled down his window but that the passenger window was up. (*Id.* at 17:17–19.) Hoffman said he did not recall if the windows were up or down, but "they were clear enough that we both observed upon approach, which is walking up to the vehicle, that the front seat passenger was jockeying around and appeared to be reaching down on the right side." (*Id.* at 30:19–22.) The government stipulated during the evidentiary hearing that the passenger window was rolled up during the traffic stop. (*Id.* at 45:6–7.) Also, it was stipulated that the windows of the car were not tinted. (*Id.* at

4

44:23–24.)

The officers were alarmed by the movement and concerned that the hands of the driver and the passenger were not visible. Hoffman testified: "Upon approaching, we were both put on edge, due to the fact that we had more movement than is normally seen. Upon myself approaching the driver side, I observed the driver, Mr. Freeman, had his hand down to his right side of his leg, which put me on guard." (*Id.* at 28:17–21.) Lichtsinn said he observed the passenger's movement when he was "somewhere between the rear door and the rear of the vehicle" (*id.* at 16:17–19; 17:3–7), and also when he was "at the trailing edge of the passenger side door," (*id.* at 15:10–11), or where the door opens and the rear door begins. At this point, Lichtsinn could see the Defendant's arm from the elbow up. Hoffman described the movement as unusual:

> You could observe that the front right shoulder or the right shoulder of the front seat passenger was moving about. Typically the most movement you'll get out of a traffic stop on a regular basis is you might get someone to look back when they see the lights or something of that nature, but he was making affirmative, frantic movement down toward the ride side of his person. Appeared to either be concealing something or retrieving something.

(*Id.* at 33:4–11.)

Because of the movement of the vehicle's occupants and the inability to see their hands, Hoffman issued orders that hands be shown. Hoffman said that he was focused on the driver and that Lichtsinn was focused on the passenger, and Hoffman characterized his orders as being directed to the driver. He testified that he ordered the driver "to show me his hands. He didn't comply. I repeated the loud command, 'Show me your hands.' He again didn't comply." (*Id.* at 28:21–23). Lichtsinn said that "Officer Hoffman ordered them to show us their hands. They failed to comply. He gave several more orders and they still failed to comply." (*Id.* at 8:19–21.)

5

Hoffman testified that his commands were "more than loud enough that both occupants could have heard." (*Id.* at 29:13–14.)

After the vehicle's occupants refused to obey the orders to display their hands, Lichtsinn said he acted out of fear for his own safety and the safety of Hoffman. Lichtsinn said the factors that caused him to be concerned about officer safety were the time of night of the traffic stop, the movement of the occupants of the vehicle, and the refusal of the occupants to obey the commands to show their hands. He testified: "At that time, due to their failure to comply, the time it took them to stop, the movement, I was in fear for my safety and I opened the door so that I could see his hands." (*Id.* at 8:25–9:2.) When Lichtsinn opened the door, he saw the Defendant's hand "resting on top of a silver in color semi-automatic handgun." (*Id.* at 9:5–6.) Lichtsinn "immediately yelled 'gun,'" (*id.* at 9:13), and then grabbed the Defendant's right hand, "directed him out of the car, put him belly down in the ground," (*id.* at 9:8–10), so that he could be handcuffed with the assistance of another officer who had arrived during the traffic stop. Hoffman testified:

> I heard Officer Lichtsinn yell, "Gun", at which point I pulled my side arm out of the low ready, and again, repeated the command [to display hands], without compliance. I reached in, grabbed the hand which was of concern to me on the driver, due to the fact that he wouldn't show me, which was his right hand, pulled it towards me and directed him to the ground, and placed him into cuffs.

(*Id.* at 28:24–29:5.) The driver was unarmed, but he was arrested based on being wanted on several outstanding warrants.

Lichtsinn said the gun was located between the passenger seat and the door jamb or door frame. A black, nylon holster was located next to the gun. The gun was loaded: there was ammunition in the magazine, but no bullet in the chamber.

6

Both officers acknowledged during cross-examination that there is no legal requirement for vehicle occupants to display their hands during traffic stops. However, Lichtsinn testified that it is common practice for officers to order occupants of a car to display their hands "if they fail to show their hands initially. I say most people initially put their hands where they can be seen. They don't purposely conceal them." (*Id.* at 14:1–3.) Hoffman said that in most traffic stops "people actually make it a point to show you their hands." (*Id.* at 29:22.) He testified: "It's more of an officer safety issue. . . . Often, in my experience, I've found that contraband is often hidden if their hands are not shown. . . . Typically if someone is not showing you their hands, they're attempting to conceal something or retrieve something, which puts it in realm of Officer safety." (*Id.* at 31:11–12, 19–20, 22–24.)

Lichtsinn said that he read the Defendant his *Miranda* rights and placed him in the police vehicle. The government stated that the Defendant was not interviewed at the scene. Instead, he was taken to police headquarters, given his *Miranda* rights (again), waived his rights, and made an admission or confession regarding this case. (*Id.* at 43:22–44:3.) The Defendant is not alleging that his *Miranda* rights were violated. (*Id.* at 44:7–10.) Defense counsel stated at the evidentiary hearing that "[o]ur issue is solely limited to the stop in the vehicle." (*Id.* at 44:11.)

The Defendant did not produce any witnesses or introduce any evidence to contradict the testimony of the officers. The two officers were forthright and straightforward in their testimony. Each officer's testimony was internally consistent, and each officer's testimony was consistent with the other officer's testimony. Nothing was elicited during cross-examination to cast doubt on their veracity, accuracy, or credibility. The Court finds that the officers and their testimony were credible, and it credits their testimony about the events of November 9, 2007.

# CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 809–10 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813).

A traffic stop is similar to an investigative detention and is thus governed by the principles set forth in *Terry v. Ohio,* 392 U.S. 1 (1968). *United States v. Finke,* 85 F.3d 1275, 1278 (7th Cir. 1996). Police officers are justified in conducting a brief investigative stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Although reasonable suspicion requires more than a mere "hunch," it is a measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In assessing the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. 21–22).

The justification to conduct a warrantless search of a vehicle is similar to the *Terry* standard:

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry*, 392 U.S. at 21). Also, these stops and searches "must be justified at [their] inception and be reasonably related in scope to the circumstances which justified the interference in the first place." *Finke*, 85 F.3d at 1279. "The detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Moreover, the least intrusive means reasonably available to verify or dispel the officer's suspicion must be employed." *Id.* (citations and internal quotations omitted).

This Court is cognizant that the Supreme Court has "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); *see also Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting the same risk applies "whether the occupant of the stopped car is a driver or passenger"); *Long*, 463 U.S. at 1049 (noting that "roadside encounters between police and suspects are especially hazardous"); *United States v. Denney*, 771 F.2d 318, 321 (7th Cir. 1985) ("[Investigative detentions involving suspects in vehicles at the roadsides are especially dangerous to the police officers.").

The Defendant argues that when Lichtsinn opened the passenger door of the vehicle, he was performing an unauthorized search because there were no grounds to reasonably believe that the Defendant posed a danger and might have had the ability to gain immediate control of a

9

weapon. (Def. Br. 1, 5, DE 25.) The government makes several arguments. It argues that opening the door was not a search and that Lichtsinn was justified in opening the door because he reasonably believed the Defendant posed a danger and "might gain control of a weapon." (Govt. Post Hr'g Br. in Opp'n to Mot. to Suppress 6.) The government also argues that because officers have the legal authority to order vehicle occupants out of car during a traffic stop as a matter of right, the gun next to the Defendant would have become visible in plain view.[3]

The Defendant concedes that there was probable cause to conduct the traffic stop because the driver violated Indiana Code § 9-21-8-25 by not activating his turn signal 200 feet before the intersection. (Def. Br. 4–5). The Defendant also correctly concedes that the subjective intent or the ulterior motive of the officer making the traffic stop is irrelevant, (*id.*), so it does not matter that Lichtsinn and Hoffman were waiting for the driver to commit a traffic violation so that they could pull the vehicle over.

The principal issue for this motion is whether Lichtsinn had justification to open the car's passenger door when he did. Secondarily, the Court has to determine what label applies to Lichtsinn's act of opening the car door.

The officers testified to a number of factors that made them suspicious of the car's occupants and increasingly concerned about their safety as the incident progressed. Because this analysis must include "the totality of the circumstances," *United States v. Evans*, 994 F.2d 317, 320 (7th Cir. 1993) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)), the Court

---

[3] The government is correct that police officers can order a vehicle's driver and passengers out of a car as a matter of course, *Maryland v. Wilson*, 519 U.S. 408, 410, 415 (1997), but the Defendant is correct that "the ability to order occupants out of a vehicle does not, by itself, provide the basis for any search of the vehicle." (Def. Br. 5.) There is no indication in the record that the officers ordered or intended to order the car's occupants to get out. As explained below, however, the basis for denying the motion to suppress does not depend on *Maryland v. Wilson* because the search of the car (opening the door was a search) was fully justified.

begins with events prior to the traffic stop. First, the car's occupants were seen leaving a house that was known to both officers as a gang location and getting into the vehicle. The Defendant in his brief did not challenge the officers' assessments that the DeWald Street residence was a gang hangout, and the Court is satisfied with the officers' basis for this view. *Cf. Evans*, 994 F.2d at 319, 321 (stating that the fact that the location where the defendant pulled over "was a reputed distribution point for drugs, or 'drug house'" "further support the reasonableness of the officers' conclusion that the defendant presented a threat to their safety"). The Defendant's departure from the gang house is a legitimate factor for Lichtsinn's suspicion and fear for officer safety. Also, the fact that the officers had not previously seen the Defendant at that gang house does not make Lichtsinn's fear or suspicion unreasonable. *Id.* ("The fact the defendant was not previously seen at the [drug house] duplex does not make this fear unreasonable.").

Second, both officers testified that the vehicle took "a while" to pull over. Hoffman's testimony and the map introduced into evidence indicated that the car continued for about a block and a half before pulling over. The Defendant did not dispute this fact. This observation supports an inference that one or both occupants of the vehicle were trying to buy time to conceal an illegal item in the car or gain access to a weapon. In *United States v. Fryer*, 974 F.2d 813 (7th Cir. 1992), officers trying to make a traffic stop

> pursued the Buick for one and a half to two blocks until it pulled over to the curb. During that brief pursuit, they noticed certain movements between the driver, Eddie Fryer, and his passenger that suggested the Buick's occupants were attempting to conceal something before stopping their car. Gonzalez, concerned that the occupants might have been trying to hide a weapon, cautioned Fahey to be careful during the stop.

*Id.* at 817. The longer-than-normal period of time to pull over in that case was a factor in the Seventh Circuit's affirming the district court's decision that the officer's "suspicions met the

*Terry/Long* standard for conducting a search of Fryer's automobile." *Id.* at 819.

The third factor was the time of night, 10:30 p.m., which both officers said was a factor in their suspicion or concern for officer safety. This also is a legitimate basis for suspicion and concern about officer safety. The traffic stop in *Fryer* "in the wee hours of the morning," 974 F.2d at 819, specifically at 2:30 a.m., was one of the circumstances that justified the search of the vehicle.

The fourth factor for Lichtsinn's suspicions and fear for safety is a significant one for the Court: the movement of the car's occupants, especially the Defendant. Lichtsinn and Hoffman testified that they both independently noted an unusual amount of movement by the car's occupants. The specific type of movement was of concern as well. Lichtsinn noted that the movement of the Defendant's right shoulder indicated he "was retrieving or placing something in or about his waistband or lower body." (Tr. 8:7–10.) Lichtsinn also described the movement as "affirmative" and "frantic," (*id.* at 33:9), and an apparent attempt to conceal or retrieve something. Furtive movements of car occupants justifies conducting a protective search of the vehicle or taking physical control of the occupants. *United States v. Arnold*, 388 F.3d 237, 238, 240 (7th Cir. 2004); *Evans*, 994 F.2d at 321; *United States v. Denney*, 771 F.2d 318, 321–22 (7th Cir. 1985); *United States v. Nash*, 876 F.2d 1359, 1360–61 (7th Cir. 1989); *Sibron v. New York*, 392 U.S. 40, 66–67 (1968) (stating that suspect's deliberately furtive movements when approached by police officers "are strong indicia of *mens rea*"). The furtive and suspicious movements of the Defendant, especially in light of the three other factors, made it reasonable for Lichtsinn to be concerned for his own and Hoffman's safety.

The Defendant argues that his movement was not furtive (the officers never used that

12

word in their testimony) but rather "brief and non-suspicious." (Def. Br. 6.) He also contrasts his movement with the movement in *United States v. Clay*, No. 2:06-CR-00056, 2007 WL 37949 (D. Nev. Jan. 3, 2007), where the movement consisted of the passenger's "torso pressed against his knees, moving his hands on the floor, and shuffling his shoulders." *Id.* at *3. The *Clay* case is of less importance than Seventh Circuit cases that "have relied on gestures similar to those of the defendant in finding that an officer reasonably feared for his safety." *Evans*, 994 F.2d at 321 (citing *Nash*, 876 F.2d at 1361, and *Denney*, 771 F.2d at 322). In *Evans*, the defendant's movement was also brief—the only description provided was that "upon their activation of the police lights and siren, the defendant leaned forward at a forty-five degree angle for several seconds, as to place or retrieve something under the seat," 994 F.2d at 321—but the court still found that "the officers reasonably interpreted the defendant's actions as a possible attempt to conceal a weapon, thus justifying a protective search of the car." *Id.* Lichtsinn testified that the Defendant's movements were not typical, while the defendant's movements in *Arnold* were described as unusual. 388 F.3d at 238, 240. The Defendant's unusual, furtive movements suggesting concealment or retrieval of a weapon fall well within the kind of movement by defendants that justify a protective search.

The fifth and final factor is the Defendant's refusal to obey Hoffman's order that he show his hands. By the time Hoffman gave the command to display hands, Lichtsinn already had four reasons to be suspicious and fearful for officer safety. The generalized suspicion about the traffic stop, based on the first three factors, had evolved into a particularized concern for safety with the unusual and furtive movement suggesting that the Defendant was concealing an item or retrieving a weapon. In *Denney*, a driver's refusal to obey an agent's order to raise his hands was

13

a factor that "intensified the officers' reasonable concerns for their safety." 771 F.2d at 322. In this case, when the Defendant's refusal to display his hands is considered in light of all of the additional circumstances, Lichtsinn was justified in opening the passenger door of the car. Under the totality of the circumstances, it was reasonable to infer from the refusal of the Defendant to show his hands that he was holding something illegal and/or dangerous.

The Defendant attacks this factor in two ways. He argues that Hoffman's testimony indicates he was ordering the driver to raise his hands, the implication being that the Defendant, as the passenger, did not believe the order was directed to him as well. The Defendant also suggests that the Defendant might not have heard the commands because the passenger window was rolled up and it is unclear if the driver's window was down when the commands were made. These arguments are unavailing.

Hoffman's testimony indicates he was directing his orders toward the driver, but Lichtsinn's testimony was that Hoffman was ordering both occupants to show their hands. This minor discrepancy is irrelevant because Lichtsinn's belief about officer safety is what matters under *Terry* and *Long*. Lichtsinn's testimony, which the Court credits, is that the order was directed to both passengers. The failure of the Defendant to raise his hands justified Lichtsinn's concern for officer safety.

Also, the Defendant's argument that the Defendant might not have heard the commands fares no better. Hoffman testified that his commands were loud enough for the Defendant to hear. The Court credits this testimony regardless of whether the driver's window was rolled down or up. The contrary view—that Hoffman made his commands loud enough for the driver to hear but not loud enough for the Defendant in the passenger seat to hear—is not plausible,

regardless of the fact that the Defendant's window was rolled up. Again, even if the Defendant did not hear the commands, what matters is whether Lichtsinn justifiably feared for his and Hoffman's safety due to the failure of the Defendant to show his hands. In sum, the Court finds that the Defendant could hear the commands to display hands and understood (or should have understood) that it applied to him as well as the driver. As a result, the Court concludes that the failure of the Defendant to raise his hands made it reasonable for Lichtsinn to fear for his safety.

Because several factors gave rise to a legitimate concern for officer safety, Lichtsinn's actions in opening the car door in order to see the Defendant's hands were justified. The government and the Defendant dispute whether opening the door was a search. The Court concludes that it was a search because Lichtsinn's intent was to look somewhere in the vehicle that he could not see unless he opened the door. This search was justified by a fear for officer safety that was based on specific, articulated facts and circumstances.

The Defendant argues that opening the door "exceeded what would be considered a permissible scope of action," (Def. Br. 7), but the Defendant does not identify what action would have been permissible. The alternatives of either continuing the orders for the occupants to display their hands or moving further forward and peering into the window would have put the officers at greater risk. The officers could have retreated behind the protection of their vehicle and waited for more officers, but that would not resolve the standoff caused by the occupants' refusal to display their hands. The officers also might have decided to use force against the occupants, but that course of action could have raised other issues. At some point, the occupants were going to have to obey the police commands to show their hands or they would be forced to do so. Lichtsinn, by opening the car door and conducting a search, justifiably effectuated the

police command: the Defendant's hand became visible. That search revealed that the Defendant's hand was on top of a handgun.

There can be no attack that the search was "longer than is necessary to effectuate the purpose of the stop," *Finke*, 85 F.3d at 1279, because the search was over an instant after it began: Lichtsinn immediately observed the gun after opening the door. And the scope or intrusiveness of the search cannot reasonably be challenged either: Lichtsinn did not have to root around for the gun because it was in plain sight after opening the door. In *Arnold*, the court ruled that a far more intrusive search of a trunk compartment was justified based on the defendant's suspicious movements during the traffic stop. 388 F.3d at 237, 240.

In sum, the circumstances of the traffic stop and the specific actions of the Defendant (unusual, furtive movement and refusal to obey the commands) formed a reasonable basis for Lichtsinn's belief that the Defendant was dangerous and may have possessed or was retrieving a weapon. As a consequence, the protective search that took the form of opening the passenger door was justified, and the act of opening the door was properly limited in time and scope. The Defendant has not established a basis to suppress the evidence recovered.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress Evidence [DE 16] is DENIED.

So ORDERED on September 2, 2008.

          s/ Theresa L. Springmann
          THERESA L. SPRINGMANN
          UNITED STATES DISTRICT COURT